IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

SHELLY WILSON          :
12284 Susquehanna Trail, South #B  :
New Freedom, PA 17349      :
                 : Civil No._____
  Plaintiff,          :
                 :
v.                :
BLUE OCEAN REALTY, LLC     :
6609 Reisterstown Road       :
Baltimore, MD 21215        :
                 :
  Defendants.         :

**COMPLAINT FOR DECLARATORY
AND MONETARY RELIEF AND JURY DEMAND**

Plaintiff files this action against Defendant for the following claims: sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") arising from her employment with and her discharge from employment with Defendant. This is an action to secure protections of and redress for the deprivation of rights guaranteed by federal law.

**JURISDICTION, VENUE, AND ADMINISTRATIVE PROCEEDINGS**

1. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 as this matter concerns a federal question.

2. Plaintiff was employed by Defendant, Blue Ocean Realty, LLC, located in Baltimore, Maryland. All acts and omissions complained of occurred in or failed to occur in

1

Maryland. Accordingly, venue lies within this judicial district pursuant to 28 U.S.C. §§ 1391(a)(2), (b)(1), and (b)(2).

3. Plaintiff has exhausted her administrative remedies, and was issued a Notice of Right to Sue by the U.S. Equal Employment Opportunity Commission on February 14, 2018.

## PARTIES

4. Plaintiff Shellie Wilson is a female adult currently residing in Pennsylvania.

5. Defendant Blue Ocean Realty, LLC ("Defendant") is a Maryland corporation that does or did conduct business in Maryland.

6. At all times relevant to this Complaint, Ms. Wilson was an employee of Defendant.

7. At all times relevant to this complaint, Defendant was Ms. Wilson's "employer" within the meaning of 42 U.S.C. §§ 2000e.

## FACTS

8. Ms. Wilson was hired by Defendant on August 5, 2010 as a Project Manager.

9. On or around February 2011, Ms. Wilson was promoted to the position of Special Assets Manager.

10. As a Special Assets Manager, Ms. Wilson managed thirteen (13) properties. This included showing each property to potential buyers, collecting payments, performing tenant relations, and coordination of maintenance.

11. As part of her job duties, Ms. Wilson also managed independent contractors.

12. Accordingly, any time she managed a new piece of property, she would visit the property to explain scheduling, goals, and the general plan for a project to the contractors.

13. Ms. Wilson would then visit each property on a daily basis to conduct a walk through, and update Defendant on the status of each project.

14. Mr. Oscar Sosa was an independent subcontractor hired by Defendant to work on certain projects.

15. On or around September 21, 2011, Ms. Wilson was assigned to oversee a project at 6609 Reisterstown Road that Mr. Sosa was working on.

16. Mr. Sosa was always very flirtatious with Ms. Wilson, and would make unprofessional comments to Ms. Wilson indicating that he was interested in having a romantic relationship with her.

17. When Ms. Wilson first met Mr. Sosa, she was married at the time, and was aware that Mr. Sosa was married as well.

18. Accordingly, Ms. Wilson always maintained a professional relationship with Mr. Sosa, and made it clear to Mr. Sosa that she did not reciprocate the unwanted romantic feelings Mr. Sosa had for her.

19. Even though Ms. Wilson informed Mr. Sosa she was not romantically interested, he continued to make inappropriate comments to her on a weekly basis.

20. Ms. Wilson reported Mr. Sosa's inappropriate behavior to her coworker, Ms. Michelle McBee.

21. Ms. McBee confronted Mr. Sosa on numerous occasions, requesting that he leave Ms. Wilson alone and stop making inappropriate sexual advances.

22. Over time, Mr. Sosa's sexual advances towards Ms. Wilson became more serious. Specifically, on or around February 2012, when Mr. Sosa was at Defendant's corporate office where Ms. Wilson works, he tried to kiss her on the mouth.

23. Ms. Wilson immediately informed Ms. Stockman-Johnson, head of Human Resources at Blue Ocean Realty, LLC, of Mr. Sosa's sexual harassment.

24. Ms. Stockman-Johnson later informed Ms. Wilson that she reported Mr. Sosa's actions to Mr. Jonathan Ehrenfeld, Defendant's CEO.

25. However, Mr. Ehrenfeld took no corrective action after Ms. Stockman-Johnson reported Mr. Sosa's sexual harassment of Ms. Wilson.

26. Further, on around March 8, 2012, Mr. Sosa visited Defendant's corporate office. Mr. Sosa walked up behind Ms. Wilson at her desk, where he proceeded to grab her breasts and fondled her vaginal area.

27. Ms. Wilson was startled and distressed, and immediately reported Mr. Sosa's sexual assault to Ms. Stockman-Johnson.

28. Ms. Wilson explicitly informed Ms. Stockman-Johnson that Mr. Sosa had been sexually harassing her for months, and that she no longer felt comfortable working with him.

29. Ms. Stockman-Johnson again reported Mr. Sosa's behavior to Mr. Ehrenfeld, but Mr. Ehrenfeld indicated that he did "not want to get in the middle of it."

30. On or around March 8, 2012, Ms. Wilson became aware that demo work was being done on the property to which Mr. Sosa was assigned.

31. Ms. Wilson knew Defendant was interested in protecting the antique flooring for the front entrance at that property, so she immediately sent Mr. Sosa a text asking, "Have protection?"

32. By "protection", Ms. Wilson was referencing the drop cloths and/or other protective supplies used on construction sites to protect the marble flooring.

33. The term "protection" is commonly used when referring to protective equipment or supplies, such as protective masks, plastic material, coveralls, drop cloths, etc., as indicated in Defendant's Safety Manual provided to all employees.

34. Mr. Sosa replied that he did not have protection, and asked Ms. Wilson to please get it before she arrived.

35. To Ms. Wilson's knowledge, Mr. Sosa eventually went to Home Depot to purchase protection for the marble flooring.

36. On March 27, 2012, notwithstanding his knowledge of Mr. Sosa's sexual harassment, Mr. Ehrenfeld instructed Ms. Wilson to go to Marble Hall, a property owned by Defendant, to perform a walk through with Mr. Sosa.

37. Due to Mr. Sosa's previous sexual harassment of Ms. Wilson, she immediately expressed to Mr. Ehrenfeld that she was uneasy and concerned about being alone with Mr. Sosa.

38. Mr. Ehrenfeld responded by stating, "You'll be fine. Oscar will be professional."

39. Ms. Wilson went to meet Mr. Sosa at the property to perform a walk through.

40. When Ms. Wilson and Mr. Sosa went to the second floor of the property to view the bedrooms, Mr. Sosa suddenly began to kiss Ms. Wilson.

41. Ms. Wilson immediately pushed Mr. Sosa off of her, and protested that she did not want him to kiss her.

42. Mr. Sosa then pushed Ms. Wilson against a wall, and pinned her shoulders to the wall while he proceeded to take off his pants.

43. At this point, Mr. Sosa fondled Ms. Wilson's vaginal area, and raped her.

44. After Mr. Sosa raped Mr. Wilson, he warned her not to tell anyone what had happened.

45. Still in shock regarding what had just taken place, Ms. Wilson left the property and went back to the office.

46. Later that evening, Ms. Wilson contacted a few friends to explain that she had been raped by Mr. Sosa. Ms. Wilson also contacted a sexual assault hotline.

47. Ms. Wilson also called Mr. Ehrenfeld and reported that Mr. Sosa had raped her.

48. Mr. Ehrenfeld told Ms. Wilson that she should go to the hospital, and to send him an email regarding what actions she wanted him to take against Mr. Sosa.

49. The next day, March 28, 2012, at 7:58 a.m., Ms. Wilson sent Mr. Ehrenfeld an email indicating that she did not want any action taken against Mr. Sosa because she was afraid for her safety.

50. That afternoon, Ms. Wilson went to Bayview Hospital and was taken by police escort to Mercy Medical Center, located at 301 St. Paul Place, Baltimore, MD 21202. After Ms. Wilson informed the staff that she had been raped, medical staff conducted a Sexual Assault Forensic Exam.

51. Once the medical staff at Mercy Medical Center determined that Ms. Wilson had been sexually assaulted, Ms. Wilson was escorted to the police station, where she met with Detective Scott to answer questions about Mr. Sosa's actions.

52. Ms. Wilson also filed a formal Incident Report with Defendant.

53. Ms. Wilson's Doctor instructed that she take two days off of work to recover, and could return to the office by Friday, March 30, 2012.

54. Ms. Wilson made a request to Mr. Ehrenfeld to stay home until the following Monday in order to recover from being raped.

55. However, Mr. Ehrenfeld refused Ms. Wilson's request and instructed Ms. Wilson to return to work by Friday, March 30, 2012.

56. Ms. Wilson returned to work on Monday, April 2, 2012, at which point Mr. Ehrenfeld informed her that Mr. Sosa was banned from all properties owned by Defendant while an investigation was conducted.

57. Ms. Wilson asked Mr. Ehrenfeld if he was going to implement any safety procedures for employees in order to prevent other employees from being sexually assaulted.

58. Mr. Ehrenfeld responded that any safety decisions were his to make, and declined to implement any safety precautions.

59. Due to Mr. Ehrenfeld's denial of implementing safety precautions, Ms. Wilson also requested self-defense classes. Mr. Ehrenfeld also denied this request.

60. Ms. Wilson also requested that Marble Hall, the property she was raped at, be removed from her responsibilities.

61. However, Mr. Ehrenfeld never removed this property from Ms. Wilson, and continued to request that Ms. Wilson return to the property to perform her job duties.

62. Each time Mr. Ehrenfeld requested Ms. Wilson return to Marble Hall, it immediately triggered flashbacks and hysteria. Accordingly, Ms. Wilson refused to return to the property each time Mr. Ehrenfeld asked.

63. Each time Ms. Wilson refused to return to the property where she was raped, Mr. Ehrenfeld would get upset with Ms. Wilson, curtly informing her that he would find someone else to take care of it since she could not properly perform her job duties.

64. While Ms. Wilson was out of work recovering from the sexual assault, Mr. Ehrenfeld told everyone at the company that Ms. Wilson was "out with the flu."

65. When it became clear that Ms. Wilson had not been sick with the flu, her coworkers eventually found out that Ms. Wilson had been raped by Mr. Sosa.

66. To Ms. Wilson's knowledge, other female project managers at the time confronted Mr. Ehrenfeld, demanding that action be taken regarding Mr. Sosa's sexual assault of Ms. Wilson.

67. On or around early April 2012, Ms. Wilson was informed that Mr. Sosa would be returning to work for Defendant, but would not be allowed on any property that Ms. Wilson was at.

68. On or around early April 2012, Mr. Ehrenfeld confronted Ms. Wilson and indicated that if she did not stop discussing her rape at work, he would have to take action.

69. On April 6, 2012, Mr. Ehrenfeld sent a memo to the entire company which stated, in part, the following: "In recent days, I have heard the rumor mill go round and round. Most if [sic] this chatter is related to a very personal and non-business related matter […] Be advised that Blue ocean strictly prohibits discussion or communication of any kind, of another employees personal affairs during business hours or while on company property […] Anyone who crosses this line will be subject to immediate suspension or termination."

70. On June 22, 2012, Mr. Ehrenfeld called Ms. Wilson into his office and told her that she needed to stop discussing her sexual assault with co-workers.

71. Ms. Wilson indicated that she was unclear what to say when co-workers asked why she had been out of the office. Mr. Ehrenfeld told her she should say it was a personal matter, and that she could not discuss it.

72. During this meeting, Mr. Ehrenfeld also informed Ms. Wilson that he felt she was dressing too provocatively at work.

73. This was the first time Ms. Wilson had ever been informed of this.

74. After this meeting, Ms. Wilson was so traumatized by Mr. Ehrenfeld's comments that she wore long sleeves, pants, or a long skirt to work every day until she was terminated.

75. On June 24, 2012, Ms. Wilson received a letter from Mr. Ehrenfeld that again reiterated "discussions relating to Personal relationship should never take place during normal business hours or while on Company property. Aside from the obvious distraction that it creates, certain individuals are generally uncomfortable conversing on the topics. It is also generally not appropriate discussion material for a professional business setting."

76. To Ms. Wilson's knowledge, Defendant never conducted an investigation regarding her rape, and she was never interviewed after her initial reporting to Mr. Ehrenfeld.

77. Ms. Wilson was also never provided a report of any findings from Defendant.

78. On January 22, 2013, Ms. Wilson filed an EEOC complaint against Defendant claiming discrimination based on sex.

79. On January 29, 2013, one week after Ms. Wilson filed her complaint, she received a letter advising her that her work hours were being reduced from 40 hours a week to 20 hours a week. The letter indicated this reduction was due to lack of available work.

80. On February 18, 2013, Ms. Wilson's hours were reduced to 20 hours a week.

81. However, Ms. Wilson's job duties were never changed or reduced, so she was still expected to perform the same amount of work, but was only paid for 20 hours of work each week.

82. Ms. Wilson addressed her concerns regarding the reduction in her hours with Mr. Ehrenfeld, but no action was taken.

83. On March 8, 2013, Complainant was terminated due to alleged negligence.

**COUNT 1: SEXUAL HARASSMENT IN VIOLATION OF TITLE VII**

84. Plaintiff incorporates the factual allegations above as though restated herein in support of her claim of sexual harassment.

85. Plaintiff was a female employee of Defendant Blue Ocean Realty, LLC.

86. Mr. Oscar Sosa, an employee of Defendant, subjected Plaintiff to a hostile work environment in the form of inappropriate comments, sexual invitations, and unwanted sexual conduct and assault.

87. The conduct alleged in the preceding paragraphs was unwelcomed and Plaintiff reported this conduct to the police.

88. The discriminatory actions taken toward Plaintiff were sufficiently severe and pervasive as to create an intimidating, hostile, and offensive work environment.

89. Plaintiff also reported this conduct to Defendant's Head of Human Resources, Ms. Stockman-Johnson, as well as the CEO, Jonathan Ehrenfeld, on numerous occasions.

90. As a consequence of Defendants' discriminatory actions, taken against Plaintiff because of her sex, Plaintiff has suffered economic harm, emotional distress, anxiety, humiliation, pain, suffering, and loss of enjoyment of life.

91. Defendant's actions were wanton, reckless, or in willful disregard of the Plaintiff's legal rights.

92. These discriminatory actions state a claim of sexual harassment pursuant to 42 U.S.C. §§ 2000e-2(a).

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII

93. Plaintiff incorporates the factual allegations above as though restated herein in support of her claim of retaliation.

94. In retaliation for filing an EEOC complaint against Defendant alleging discrimination based on sex, Defendant reduced Plaintiff's hours without reducing her workload, and eventually terminated Plaintiff.

95. Defendant's retaliation against Plaintiff violates 42 U.S.C. §§ 2000e-3(a).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that the Court:

(a) Grant judgment for Plaintiff against Defendants on all counts;

(b) Order Defendant to pay to Plaintiff as equitable relief, backpay, prejudgment interest, fringe benefits, front pay, and any other appropriate relief to make Plaintiff whole and compensate her for the civil rights violations described above, these amounts to be determined at trial;

(c) Order Defendant to pay to Plaintiff compensatory damages in amounts to be determined at trial;

(d) Order Defendant to pay to Plaintiff punitive damages in amounts to be determined at trial;

(e) Order Defendant to pay Plaintiff's reasonable attorney's fees and costs;

(f) Order any other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Respectfully submitted by,

*[signature]*

Joseph T. Spoerl, Bar No. 20256
Jspoerl-efile@gelawyer.com

*[signature]*

Gary M. Gilbert, Bar No. 15808
Gary-efile@gelawyer.com


Gilbert Employment Law, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
Tel: (301) 608-0880
Fax: (301) 608-0881

*Attorneys for the Plaintiff*